United States District Court
Southern District of Texas
FILED

JAN 2 4 2020

David J. Bradley, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## McALLEN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF TEXAS, *EX REL.* [UNDER SEAL], | Civil Action No. **M - 20 - 0022** |
| Plaintiff, | **ORIGINAL COMPLAINT FOR VIOLATION OF FALSE CLAIMS ACT and TEXAS MEDICAID FRAUD PREVENT ACT** |
| vs. | |
| [UNDER SEAL], | **FILED UNDER SEAL** |
| Defendants. | **JURY TRIAL DEMANDED** |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## McALLEN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF TEXAS, *EX REL.* MARK MASSO, <br><br> Plaintiff, <br><br> vs. <br><br> CORNERSTONE REGIONAL HOSPITAL, L.P., SOUTH TEXAS HEALTH SYSTEM, McALLEN HOSPITALS, L.P., and DR. RAUL A. MARQUEZ, <br><br> Defendants. | Civil Action No.   M - 2 0 - 0 0 2 2 <br><br> **JURY TRIAL DEMANDED** |

## ORIGINAL COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT AND TEXAS MEDICAID FRAUD PREVENTION ACT

### INTRODUCTION

1.     Plaintiffs and *qui tam* relator Mark Masso, individually and on behalf of the United States of America and the State of Texas, brings this action to recover damages, penalties, and attorneys' fees for violations of the Federal False Claims Act ("FCA") and the Texas Medicare Fraud Prevention Act ("TMFPA") committed by Dr. Raul A. Marquez, III ("Marquez"), Cornerstone Regional Hospital, L.P. ("Cornerstone"), McAllen Hospitals, LP, and South Texas Health Systems (collectively "the Defendants"). The Defendants have submitted or caused to be submitted hundreds of false certifications and claims to federal and state agencies in conjunction with requests for payment by Medicare, Medicaid, and TriCare (formerly known as Civilian Health and Medical Program of the Uniformed Services (CHAMPUS)) for surgical and other medical procedures performed at Cornerstone. Unbeknownst to federal and state agencies receiving the claims, and in plain violation of federal and state law, the Defendants have engaged in a pattern and practice of submitting claims that certify that Marquez performed medical procedures on patients, when in reality persons from Mexico who are not qualified nor licensed

to practice in Texas or in any state performed the procedures. The procedures included total knee replacements and total hip replacements, among other types of complex and potentially dangerous medical procedures. With the untrained, unlicensed Mexican nationals performing surgeries, Marquez was free to schedule more procedures in a day than he could have otherwise, allowing Marquez and Cornerstone to bill for and collect more funds from government health insurance programs. Cornerstone knew about and approved the scheme. Cornerstone had received complaints about the scheme, but did nothing to stop the fraudulent and dangerous activity. Rather, Cornerstone continued to submit its own claims to Medicare, Medicaid, and TriCare, each time certifying that Marquez had performed the procedure.

2.      Defendants have engaged in this pattern and practice since early 2016 and have caused hundreds of false certifications and claims to be made to federal and state agencies. The United States Government and the State of Texas, in reliance upon the Defendants' misrepresentations, have suffered millions of dollars in damages.

3.      Plaintiff and *qui tam* relator Masso now seeks relief on behalf of the United States Government and the State of Texas for these injuries herein and imposition of statutory penalties and attorneys' fees for the Defendants' violations of the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended ("the FCA") and the Texas Medicaid Fraud Prevention Act, Tex. Human Res. Code §§ 36.001, *et seq* ("the TMFPA").

4.      Relator brings this action based on his direct knowledge and also on information and belief. The facts and allegations underlying this Complaint have not been publicly disclosed, as public disclosure is defined under 31 U.S.C. § 3730. The relator is an original sources of facts alleged in this Complaint, as defined under 31 U.S.C. § 3730(e).

5.      As required by the FCA, 31 U.S.C. § 3730(b)(2), and the TMFPA, Tex. Human Res. Code § 36.102, the relator has provided to the Attorney General of the United States, the United States Attorney for the Southern District of Texas, and the Attorney General of the State of Texas simultaneous with and/or prior to the filing of this Complaint, a disclosure statement of all material evidence and information related to the Complaint. This disclosure statement is

2

supported by material evidence known to the relator at the time of this filing, establishing the existence of the Defendants' legal responsibility for those false claims. Because the statement includes attorney-client communications and work product of relator's attorneys, and is submitted to the U.S. Attorney General, the U.S. Attorney, and the Texas Attorney General in their capacity as potential co-counsel in the litigation, these disclosures are confidential.

## RELEVANT FEDERAL AND STATE LAW

6.      The FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty, stated in the statute as not less than $5,000 or more than $10,000 but adjusted for inflation, for each such claim submitted or paid, plus three times the amount of the damages sustained by the Government. Liability attaches both when a defendant knowingly presents, or causes to be presented, a false claim for payment from the Government and when false records or statements are knowingly used, or caused to be used, for payment from the Government. The FCA allows any person having information regarding a false or fraudulent claim against the Government to bring an action for himself (as "relator") on behalf of the Government and to share in any recovery. The Complaint is filed under seal for 60 days (without service on the defendants during that period) to enable the Government: (a) to conduct its own investigation without the defendants' knowledge, and (b) to determine whether to join the action.

7.      The TMFPA similarly provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the State of Texas for payment or approval under the Medicaid program is liable for a civil penalty of not less than $5,000 and not more than $10,000 for each such claim submitted or paid, plus two times the amount of the damages sustained by the State. Liability attaches to a defendant who knowingly makes, or causes to be made, a false statement on an application for payment under the Medicaid program and to a defendant who knowingly makes, or causes to be made, a false statement concerning information required by federal or state law pertaining to Medicaid. In addition, liability attaches if a defendant knowingly charges, solicits, accepts, or receives money as a condition to providing

service to a Medicaid recipient if the cost of the service is paid for, in whole or in part, by Medicaid. The TMFPA also allows any person having information regarding a false or fraudulent claim against the State to bring an action for himself on behalf of the State and to share in any recovery.

8. Based on these provisions, *qui tam* plaintiff and relator Mark Masso seeks through this action to recover damages, civil penalties, and attorneys' fees arising from the Defendants' submission, or actions that caused the submission, of false and fraudulent claims, records, and statements to the United States Government and the State of Texas in order to obtain payments from Medicare, Medicaid, and TriCare.

## GOVERNMENT HEALTHCARE PROGRAMS

9. The Medicare program, as enacted under Title XVIII of the Social Security Act of 1965, 42 U.S.C. §§ 1395, *et seq.*, pays for costs of certain healthcare services. Entitlement to Medicare is based on age, disability, or affliction with certain diseases.

10. The Medicaid program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, *et seq.*, provides medical assistance for indigent individuals. Although federally created, the Medicaid program is a joint federal-state program. Both the United States and the State of Texas fund the Medicaid program.

11. TriCare Management Activity, formerly known as CHAMPUS, is a program of the Department of Defense that helps pay for covered civilian health care obtained by military beneficiaries, including retirees, their dependents, and dependents of active-duty personnel. 10 U.S.C. §§ 1079, 1086; 32 C.F.R. Part 199. TriCare contracts with fiscal intermediaries and managed care contractors to review and pay claims.

12. An explanation of how the government is billed for qualified healthcare is crucial to understanding how the Defendants are liable under the FCA and TMFPA. There are two general components to government-funded healthcare, Part A and Part B. Part A is for hospital billing and skilled nursing care. Part B is for physician or physician-group billing. Every Medicare, Medicaid, and TriCare claim submitted by either a hospital or a physician must

include a unique billing number, known as the healthcare provider's National Provider Identifier ("NPI").

13.     To be eligible for Medicare reimbursement, a hospital or physician must apply for a NPI with the National Plan and Provider Enumeration System ("NPPES"). Once approved, the hospital or physician then receives a NPI, which is used as an identifier on billing forms. This provider number is cross-referenced with the provider's tax ID number.

14.     To be eligible for Texas Medicaid reimbursement, a hospital or physician must enroll with the Texas Medicaid Healthcare Partnership ("TMHP") through an application process. Under federal law, Medicaid is the payor of last resort. That is, Medicare-covered services must first be billed to and paid by Medicare. Thus, a hospital or physician must be a Medicare participant in order to enroll in Texas Medicaid.

15.     To be eligible for TriCare reimbursement, a hospital or physician must apply for certification through TriCare. Like Medicaid, TriCare is a payor of last resort. Thus, a hospital or physician must be a Medicare participant, and have a valid NPI, in order to become certified.

16.     When submitting a bill to Medicare, Medicaid, or TriCare, the healthcare provider must use code numbers to identify which services, diagnoses, or procedures were rendered. These billing codes are contained in manuals known as the Healthcare Common Procedure Coding System ("HCPCS"), which is based on the American Medical Association's Current Procedural Terminology ("CPT").

17.     Physicians enter these codes on form CMS-1500. Hospitals use form CMS-1450. Both forms are universal and are submitted to most third-party payors of healthcare services, including Medicare, Medicaid, and TriCare. The forms are submitted electronically and designed to be read quickly and easily. The codes entered onto the forms establish what services were performed, by whom, and how much the government is charged. Based on these codes, Medicare, Medicaid, and TriCare determine how much they will pay.

18.     When submitted under either Part A or Part B, physicians and hospitals are responsible for ensuring that all Medicare, Medicaid, and TriCare claims accurately reflect the

services rendered and by whom. CMS-1500 claims, for example, include a certification that the services listed were medically necessary and "were personally furnished by me or my employee under my personal direction." In addition, the form carries the warning:

> **NOTICE: Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.**

19.     Examples of false healthcare claims to the Government include:

    a.  The healthcare practitioner or provider presents a claim for payment for a medical item or service that the person knows or should know is not provided as claimed. 42 U.S.C. § 1320a-7a(a)(1).

    b.  The healthcare practitioner or provider presents a claim for payment for a medical item or service that the person knows or should know is false or fraudulent. 42 U.S.C. § 1320a-7a(a)(1)(B); 42 U.S.C. § 1320a-7b(a).

    c.  The healthcare practitioner or provider presents a claim for payment for a medical item or service that the person knows or should know is not provided by a licensed physician. 42 U.S.C. § 1320a-7a(a)(c)(i).

    d.  The healthcare practitioner or provider submits a claim found to be false, fictitious or fraudulent or supported by a written statement that is false fictitious, fraudulent or lacking a material fact required to be included. 31 U.S.C. § 3801 *et seq.*

20.     Simply put, government-funded healthcare is run on an honor system. Both the federal and state government rely on accurate codes and truthful representations when receiving claims. The entire network of government healthcare payors is designed to assure American taxpayers that they pay only for medical and hospital services ordered and rendered by qualified physicians.

**PARTIES**

21.     *Qui tam* plaintiff and relator, Mark Masso, is a resident of Hidalgo County, Texas. Masso brings this action for violations of 31 U.S.C. §§ 3729, *et seq.* on behalf of himself, the United States Government pursuant to 31 U.S.C. § 3730(b)(1), and the State of Texas pursuant to Texas Human Resources Code § 36.101. Masso has personal knowledge of the fraudulent

6

practices regarding the Defendants' claims submitted for payment by Medicare, Medicaid, and TriCare.

22.     Defendant Marquez is a resident of Hidalgo County, Texas. Marquez is a physician who practices at Cornerstone.

23.     Defendant Cornerstone is a Texas limited partnership with its principal place of business in Hidalgo County, Texas.

24.     Defendant South Texas Health System is a network of Rio Grande Valley hospitals, including McAllen Medical Center. It is owned and operated by a subsidiary of Universal Health Services, Inc.

25.     Defendant McAllen Hospitals L.P. is a Delaware subsidiary of Universal Health Services, Inc. and operates under South Texas Health Systems.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over the subject matter of this FCA action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

27.     This Court has supplemental jurisdiction over this case for the claims brought on behalf of the State of Texas pursuant to 31 U.S.C. § 3732(b), inasmuch as recovery is sought on behalf of the State of Texas which arises from the same transactions and occurrences as the claim brought on behalf of the United States.

28.     This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a), which provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant can be found, resides, transacts business or in which any act proscribed by section 3729 occurred." Section 3732(a) also authorizes nationwide service of process. During the relevant period, Defendants resided and/or transacted business in the Southern District of Texas and many of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

29. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found in, reside in, and/or transact business in the Southern District of Texas and because many of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

## BACKGROUND

FALSE CLAIMS

30. In 2016, relator Mark Masso was employed by Smith & Nephew as a medical-device sales representative in the Rio Grande Valley. He sold surgical implants and trauma-room devices to hospitals and doctors in the area, including Defendants Marquez and Cornerstone. Marquez practices at Defendant Cornerstone as an orthopedic surgeon.

31. In addition to their business relationship, Marquez came to rely on Masso. At Marquez's request, Masso would join Marquez in the operating room so that he could assist by, among other things, opening medical-device packaging, ensuring the medical operation had all items necessary to complete the scheduled procedure, and answering questions about how the medical device worked and fit.

32. Beginning in at least early 2016, Marquez began allowing Mexican nationals to perform orthopedic surgery and other orthopedic procedures at Cornerstone. These Mexican nationals were not trained to perform orthopedic surgery or other orthopedic procedures and were not licensed to practice medicine in Texas or any other state. Because they were not licensed physicians, they could not obtain the appropriate billing numbers to submit claims to government health-insurance programs.

33. Masso witnessed first-hand that untrained, unlicensed Mexican nationals were performing critical parts of surgeries. In fact, Masso saw that nearly all of the procedures that Marquez was scheduled to perform were in fact performed by untrained, unlicensed Mexican nationals. These persons would cut through tissue and bone, install artificial joints, and close the incision site, all without a license to practice medicine. While the untrained, unlicensed Mexican nationals were performing these operations, they were assisted by employees of Cornerstone.

8

34.     It happened so often that there are too numerous occasions to list in this Complaint. Examples, however, have been documented with Cornerstone.

**Illustrative Examples of False Claims**

35.     Illustrative examples of Marquez and Cornerstone's conduct and resulting false claims include but are not limited to the following:

36.     On August 1, 2017, an untrained, unlicensed Mexican performed a left knee replacement on a 64 year old female, a left knee replacement on a 77 year old female, and a left knee replacement on a 76 year old female. The untrained, unlicensed Mexican national performed the entire procedure for each patient, including all critical portions of the left knee replacements. All of these patients were Medicare patients. Marquez billed Medicare as if he had performed the procedures. Likewise, Cornerstone billed Medicare as if Marquez had performed the procedure and also billed Medicare knowing that each of the procedures had been performed by an untrained, unlicensed Mexican national.

37.     On August 23, 2017, an untrained, unlicensed Mexican national performed a right knee replacement on a 53 year old male. The untrained, unlicensed Mexican national performed the entire procedure, including all critical portions of the right knee replacement. The patient was covered by TriCare, and Marquez and Cornerstone both billed TriCare as if Marquez had performed the procedure and in spite of knowing that the procedure had been performed by an untrained, unlicensed Mexican national.

38.     On September 15, 2017, an untrained, unlicensed Mexican national performed a right knee replacement on a 66 year old female. On September 18, 2017, an untrained, unlicensed Mexican national performed a left knee replacement on a 72 year old female. The Mexican national performed the entire procedure for each patient, including all critical portions of the knee replacements. Both of these patients were Texas Medicaid patients. Marquez billed Medicaid as if he had performed the procedures. Likewise, Cornerstone billed Medicaid as if Marquez had performed the procedure and also billed Medicaid knowing that each of the procedures had been performed by an untrained, unlicensed Mexican national.

**Photo Evidence of The Scheme**

     Masso took photos with his phone in which a Mexican national is performing critical portions of surgery. One photo shows the Mexican national drilling screws into a patient's knee.



     39.    Another photo shows the untrained, unlicensed Mexican national preparing to insert an implant into a patient's knee. The patient's knee is completely exposed and a Cornerstone employee looks on.

10



40. It was Defendants' pattern and practice for untrained, unlicensed Mexican nationals to perform surgeries for which Marquez and Cornerstone would ultimately bill government payors. Although Masso did not attend every orthopedic procedure at Cornerstone, nearly every procedure he witnessed involved an untrained, unlicensed Mexican national performing key and critical portions of surgeries.

41. Marquez is an approved Medicare physician with a billing number. Likewise, Cornerstone is an approved institution with a billing number. Both Marquez and Cornerstone submitted bills to Medicare, Medicaid, and TriCare for professional services to patients, which were ultimately paid by, through, or under the auspices of the United States Government or the State of Texas, as described above.

42. The untrained, unlicensed Mexican nationals did not bill for patient care because they could not without a valid billing number. Nevertheless, the untrained, unlicensed Mexican nationals performed hundreds of surgical procedures and Marquez and Cornerstone submitted

11

claims for those procedures as if Marquez had performed them.

43.     When Marquez and Cornerstone submitted their separate claims to the United States Government and the State, both warranted and represented that the services in such claims were rendered by Marquez, a duly licensed physician. Many of the professional services rendered, if not all of them, in part or in whole to the patients, were nevertheless those of untrained, unlicensed Mexican nationals.

44.     Thus, false claims were submitted, and the Government and State defrauded, because Marquez and Cornerstone participated in a scheme where untrained, unlicensed Mexican nationals operated on Medicare, Medicaid, and TriCare patients and Marquez and Cornerstone billed for those procedures as if Marquez had performed them, in direct violation of federal and state law.

45.     These claims were false on their face because they falsely identify Marquez as the physician who performed the billed-for services when in fact untrained, unlicensed Mexican nationals had rendered those services. These claims were also legally false because Marquez and Cornerstone falsely certified that the procedures complied with various federal and state laws and regulations[1] when in fact they violated such laws.[2] In addition, Marquez and Cornerstone

---

[1] Marquez and Cornerstone signed CMS Provider Agreements, which are required to establish eligibility to receive payment and reimbursement from Medicare, Medicaid, and TriCare. The Agreements require certification as follows: "I agree to abide by the Medicare laws, regulations and program instructions that apply to [me] . . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare." Similarly, both Marquez and Cornerstone signed Electronic Data Interchange Enrollment Forms, a prerequisite to receiving payment for electronic claims submitted to government healthcare programs, and these forms require Marquez and Cornerstone "to abide by the laws, regulations and the program instructions of Medicare."

In addition, Cornerstone submits an annual cost report to the Center for Medicare and Medicaid Services, which must be certified by the hospital administrator or chief financial officer as a condition of payment. *See* C.F.R. §§ 413,1(a)(2); 413,23(f)(4)(ii). The signatory must certify that he or she is "familiar with the laws and regulations regarding the provisions of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations."

[2] The untrained, unlicensed Mexican national's performance of surgical procedures violated a host of federal and state laws and regulations, including but not limited to 42 U.S.C. § 1320c-5(a)(2) (requiring Medicare and Medicaid providers to provide services that meet "professionally recognized standards of healthcare"); 42 U.S.C.

falsely certified on each claim that Marquez had performed the billed-for services

46.    Cornerstone was aware of this scheme. But untrained, unlicensed Mexican nationals continued to perform medical procedures, and Marquez and Cornerstone continued to bill Medicare, Medicaid, and TriCare as if Marquez had performed the procedures.

47.    Cornerstone made a concerted effort to conceal and perpetuate the scheme so that Marquez could continue his overdone surgery schedule. Cornerstone has a strong financial incentive to maintain Marquez's high volume of surgeries. On information and belief, Marquez charges Medicare and Medicaid about $4,000 per surgery; Cornerstone charges about $16,000 per surgery.

48.    The examples provided in this Complaint are only a few examples of the overall scheme to file false claims. But they provide fair notice for the types of instances at issue in this Complaint.

49.    The total amount of false claims for all patients is inestimable at this stage of the litigation. But it likely amounts to many millions of dollars.

## COUNT 1

### Violations of the Federal False Claims Act

### [31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B)]

50.    *Qui tam* plaintiff and relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 59 of this Complaint.

51.    This is a claim for treble damages and forfeitures under the FCA, 31 U.S.C. §§ 3729, *et seq.*, as amended.

52.    Through the acts described above, Defendants submitted and/or caused to be submitted to officers, employees, or agents of the United States Government false or fraudulent claims for payment or approval under the Government's Medicare, Medicaid, and/or TriCare program with knowledge of their falsity, or with grossly negligent or reckless disregard of facts

---

§ 1395y(a)(1)(A) ("No payment may be made under part A or part B for any expenses incurred for items or services . . . which . . . are not reasonable and necessary.").

and conditions that would indicate that said statements or records were inaccurate or inappropriate and false.

53. Through the acts described above, Defendants made, used, or caused to be made or used, false records and statements to obtain government payment of false or fraudulent claims which would not have been paid if the truth were known. Defendants had knowledge of the falsity of the records or statements, or had grossly negligent or reckless disregard of facts and conditions that would indicate that said statements or records were inaccurate or inappropriate and false.

54. Plaintiff, the United States Government, unaware of the falsity of these claims, records, and/or statements made by Defendants, and in reliance on the accuracy thereof, paid Defendants for medical and/or physician services performed by someone who was not the physician listed in the claim, record, and/or statement and/or services that were tainted by violations of federal law.

55. By reason of defendants' false records, statements, claims, and omissions, the United States has been damaged in the amount of many millions of dollars. For each bill that is tainted by the Defendants' illegal acts and scheme, the United States Government is entitled to treble damages and forfeitures as well as the per-claim penalty amount under the False Claims Act.

## COUNT 2

### False Claims Conspiracy

### [31 U.S.C. §§ 3729(a)(1)(C)]

56. *Qui tam* plaintiff and relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 59 of this Complaint.

57. This is a claim for treble damages and forfeitures under the FCA, 31 U.S.C. §§ 3729, *et seq.*, as amended.

58. Through the acts described above, Defendants entered one or more conspiracies among and between themselves and others to defraud the United States Government by getting

false and fraudulent claims approved or paid. Defendants, moreover, took substantial steps in furtherance of those conspiracies by preparing false records and claims and submitting such documents to the Government via the Medicare, Medicaid, and TriCare system for payment or approval.

59.     A known or intended result of Defendants' conspiracy was to induce the Government to pay for physician services performed by someone who was not the physician listed in the claim and/or for fraudulent hospital services and medical care as described above.

60.     Plaintiff, the United States Government, unaware of the falsity of these claims, records, and/or statements made by Defendants, and in reliance of the accuracy thereof, paid Defendants for medical and/or physician services performed by someone who was not the physician listed in the claim, record, and/or statement and/or services that were tainted by violations of federal law.

61.     By reasons of Defendants' conspiracies, and the acts taken in furtherance thereof, the United States Government has been damaged in a substantial amount. For each bill that is tainted by Defendants' illegal acts and conspiracy, the United States Government is entitled to treble damages and forfeitures as well as the per-claim penalty amount under the False Claims Act.

## COUNT 3

### Violations of the Texas Medicaid Fraud Prevention Act
### [Tex. Human Res. Code Ann. §§ 36.002(1), (4)(B).]

62.     *Qui tam* plaintiff and relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 59 of this Complaint.

63.     This is a claim for double damages and forfeitures under the TMFPA, Tex. Human Res. Code Ann § 36.001, *et seq.*, as amended.

64.     Through the acts described above, Defendants made and/or caused to be made a false statement or misrepresentation of a material fact on an application for payment under the Medicaid program with knowledge of the misrepresentation, or with grossly negligent or

reckless disregard of facts and conditions that would indicate that said statements or records were inaccurate or inappropriate and false.

65.     Through the acts described above, Defendants made, caused to be made, induced, or sought to induce the making of false statements or misrepresentations of material fact concerning information required to be provided by federal and/or state laws, rules, and regulations pertaining to the Medicaid program.

66.     Plaintiff, the State of Texas, unaware of the falsity of these claims, records, and/or statements made by Defendants, and in reliance on the accuracy thereof, paid Defendants for medical and/or physician services performed by someone who was not the physician listed in the claim, record, and/or statement and/or services that were tainted by violations of federal law.

67.     By reason of defendants' false records, statements, claims, and omissions, the State of Texas has been damaged in the amount of many millions of dollars. For each bill that is tainted by the Defendants' illegal acts and scheme, the State of Texas is entitled to double damages and forfeitures as well as the per-claim penalty amount under the statute.

## **PRAYER**

68.     WHEREFORE, *qui tam* plaintiff and relator prays for judgment against Defendants as follows:

69.     That Defendants cease and desist from violating 31 U.S.C. §§ 3729, *et seq.* and Texas Human Resources Code § 36.001, *et seq.*

70.     That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions, two times the amount of damages the States of Texas has sustained as a result of Defendants' actions, and the maximum civil penalty against each defendant for each violation of 31 U.S.C. § 3729, *et seq.*, and Texas Human Resources Code § 36.001, *et seq.*

71.     That *qui tam* plaintiff and relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and Texas Human Resources Code § 36.110.

72.     That *qui tam* plaintiff and relator be awarded all costs and expenses of this action,

including attorneys' fees and court costs; and

73. That the United States and *qui tam* plaintiff and relator receive all such other relief as the Court deems just and proper.

## **JURY DEMAND**

74. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, *qui tam* plaintiff and relator hereby demands trial by jury.

Dated: January 24, 2020

Respectfully submitted,

*/s/ Omar Ochoa*
Omar Ochoa
S.D. Tex. Bar No. 2081960
OMAR OCHOA LAW FIRM PC
121 N. 10th Street
McAllen, Texas 78543
Telephone: (956) 630-3266

Victor Rodriguez
S.D. Tex. Bar No. 562260
VICTOR RODRIGUEZ LAW FIRM PC
121 N. 10th Street
McAllen, Texas 78543
Telephone: (956) 630-3266

*Attorneys for Relator Mark Masso*