**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF TEXAS, *EX REL.* MARK MASSO,<br><br>                Plaintiff,<br><br>        vs.<br><br>CORNERSTONE REGIONAL HOSPITAL, L.P. and DR. RAUL A. MARQUEZ,<br><br>                Defendants. | Civil Action No. 7:20-cv-0022<br><br>**JURY TRIAL DEMANDED** |

## SECONDED AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT AND TEXAS MEDICAID FRAUD PREVENTION ACT

### INTRODUCTION

1.      Plaintiffs and *qui tam* relator Mark Masso, individually and on behalf of the United States of America and the State of Texas, brings this action to recover damages, penalties, and attorneys' fees for violations of the Federal False Claims Act ("FCA") and the Texas Medicare Fraud Prevention Act ("TMFPA") committed by Dr. Raul A. Marquez, III ("Marquez") and Cornerstone Regional Hospital, L.P. ("Cornerstone") (collectively "the Defendants"). The Defendants have submitted or caused to be submitted hundreds of false certifications and claims to federal and state agencies in conjunction with requests for payment by Medicare, Medicaid, and TriCare (formerly known as Civilian Health and Medical Program of the Uniformed Services (CHAMPUS)) for surgical and other medical procedures performed at Cornerstone. Unbeknownst to federal and state agencies receiving the claims, and in plain violation of federal and state law, the Defendants have engaged in a pattern and practice of submitting claims that certify that Marquez performed medical procedures on patients, when in reality persons from Mexico who are not qualified nor licensed to practice in Texas or in any state performed the procedures. The procedures included total knee replacements and total hip

replacements, among other types of complex and potentially dangerous medical procedures. With the untrained, unlicensed Foreign Persons performing surgeries, Marquez was free to schedule more procedures in a day than he could have otherwise, allowing Marquez and Cornerstone to bill for and collect more funds from government health insurance programs. Cornerstone knew about and approved the scheme. Cornerstone also directly aided the scheme. Cornerstone had received complaints about the scheme, but did nothing to stop the fraudulent and dangerous activity. Rather, Cornerstone continued to submit its own claims to Medicare, Medicaid, and TriCare, each time certifying that Marquez had performed the procedure and each time knowing that the procedures violated state and federal law.

2.      Defendants have engaged in this pattern and practice since early 2016 and have caused hundreds of false certifications and claims to be made to federal and state agencies. The United States Government and the State of Texas, in reliance upon the Defendants' misrepresentations, have suffered millions of dollars in damages.

3.      Plaintiff and *qui tam* relator Masso now seeks relief on behalf of the United States Government and the State of Texas for these injuries herein and imposition of statutory penalties and attorneys' fees for the Defendants' violations of the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended ("the FCA") and the Texas Medicaid Fraud Prevention Act, Tex. Human Res. Code §§ 36.001, *et seq* ("the TMFPA").

4.      Relator brings this action based on his direct knowledge and also on information and belief. The facts and allegations underlying this Complaint have not been publicly disclosed, as public disclosure is defined under 31 U.S.C. § 3730. The relator is an original sources of facts alleged in this Complaint, as defined under 31 U.S.C. § 3730(e).

5.      As required by the FCA, 31 U.S.C. § 3730(b)(2), and the TMFPA, Tex. Human Res. Code § 36.102, the relator has provided to the Attorney General of the United States, the United States Attorney for the Southern District of Texas, and the Attorney General of the State of Texas simultaneous with and/or prior to the filing of this Complaint, a disclosure statement of all material evidence and information related to the Complaint. This disclosure statement is

2

supported by material evidence known to the relator at the time of this filing, establishing the existence of the Defendants' legal responsibility for those false claims. Because the statement includes attorney-client communications and work product of relator's attorneys, and is submitted to the U.S. Attorney General, the U.S. Attorney, and the Texas Attorney General in their capacity as potential co-counsel in the litigation, these disclosures are confidential.

## <u>RELEVANT FEDERAL AND STATE LAW</u>

6.     The FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty, stated in the statute as not less than $5,000 or more than $10,000 but adjusted for inflation, for each such claim submitted or paid, plus three times the amount of the damages sustained by the Government. Liability attaches both when a defendant knowingly presents, or causes to be presented, a false claim for payment from the Government and when false records or statements are knowingly used, or caused to be used, for payment from the Government. The FCA allows any person having information regarding a false or fraudulent claim against the Government to bring an action for himself (as "relator") on behalf of the Government and to share in any recovery. The Complaint is filed under seal for 60 days (without service on the defendants during that period) to enable the Government: (a) to conduct its own investigation without the defendants' knowledge, and (b) to determine whether to join the action.

7.     The TMFPA similarly provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the State of Texas for payment or approval under the Medicaid program is liable for a civil penalty of not less than $5,000 and not more than $10,000 for each such claim submitted or paid, plus two times the amount of the damages sustained by the State. Liability attaches to a defendant who knowingly makes, or causes to be made, a false statement on an application for payment under the Medicaid program and to a defendant who knowingly makes, or causes to be made, a false statement concerning information required by federal or state law pertaining to Medicaid. In addition, liability attaches if a defendant knowingly charges, solicits, accepts, or receives money as a condition to providing

3

service to a Medicaid recipient if the cost of the service is paid for, in whole or in part, by Medicaid. The TMFPA also allows any person having information regarding a false or fraudulent claim against the State to bring an action for himself on behalf of the State and to share in any recovery.

8.     Based on these provisions, *qui tam* plaintiff and relator Mark Masso seeks through this action to recover damages, civil penalties, and attorneys' fees arising from the Defendants' submission, or actions that caused the submission, of false and fraudulent claims, records, and statements to the United States Government and the State of Texas in order to obtain payments from Medicare, Medicaid, and TriCare.

## GOVERNMENT HEALTHCARE PROGRAMS

9.     The Medicare program, as enacted under Title XVIII of the Social Security Act of 1965, 42 U.S.C. §§ 1395, *et seq.*, pays for costs of certain healthcare services. Entitlement to Medicare is based on age, disability, or affliction with certain diseases.

10.     The Medicaid program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, *et seq.*, provides medical assistance for indigent individuals. Although federally created, the Medicaid program is a joint federal-state program. Both the United States and the State of Texas fund the Medicaid program.

11.     TriCare Management Activity, formerly known as CHAMPUS, is a program of the Department of Defense that helps pay for covered civilian health care obtained by military beneficiaries, including retirees, their dependents, and dependents of active-duty personnel. 10 U.S.C. §§ 1079, 1086; 32 C.F.R. Part 199. TriCare contracts with fiscal intermediaries and managed care contractors to review and pay claims.

12.     An explanation of how the government is billed for qualified healthcare is crucial to understanding how the Defendants are liable under the FCA and TMFPA. There are two general components to government-funded healthcare, Part A and Part B. Part A is for hospital billing and skilled nursing care. Part B is for physician or physician-group billing. Every Medicare, Medicaid, and TriCare claim submitted by either a hospital or a physician must

4

include a unique billing number, known as the healthcare provider's National Provider Identifier ("NPI").

13.     To be eligible for Medicare reimbursement, a hospital or physician must apply for a NPI with the National Plan and Provider Enumeration System ("NPPES"). Once approved, the hospital or physician then receives a NPI, which is used as an identifier on billing forms. This provider number is cross-referenced with the provider's tax ID number.

14.     To be eligible for Texas Medicaid reimbursement, a hospital or physician must enroll with the Texas Medicaid Healthcare Partnership ("TMHP") through an application process. Under federal law, Medicaid is the payor of last resort. That is, Medicare-covered services must first be billed to and paid by Medicare. Thus, a hospital or physician must be a Medicare participant in order to enroll in Texas Medicaid.

15.     To be eligible for TriCare reimbursement, a hospital or physician must apply for certification through TriCare. Like Medicaid, TriCare is a payor of last resort. Thus, a hospital or physician must be a Medicare participant, and have a valid NPI, in order to become certified.

16.     When submitting a bill to Medicare, Medicaid, or TriCare, the healthcare provider must use code numbers to identify which services, diagnoses, or procedures were rendered. These billing codes are contained in manuals known as the Healthcare Common Procedure Coding System ("HCPCS"), which is based on the American Medical Association's Current Procedural Terminology ("CPT").

17.     Physicians enter these codes on form CMS-1500. Hospitals use form CMS-1450. Both forms are universal and are submitted to most third-party payors of healthcare services, including Medicare, Medicaid, and TriCare. The forms are submitted electronically and designed to be read quickly and easily. The codes entered onto the forms establish what services were performed, by whom, and how much the government is charged. Based on these codes, Medicare, Medicaid, and TriCare determine how much they will pay.

18.     When submitted under either Part A or Part B, physicians and hospitals are responsible for ensuring that all Medicare, Medicaid, and TriCare claims accurately reflect the

services rendered and by whom. CMS-1500 claims, for example, include a certification that the services listed were medically necessary and "were personally furnished by me or my employee under my personal direction." In addition, the form carries the warning:

> **NOTICE: Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.**

19. Examples of false healthcare claims to the Government include:

a. The healthcare practitioner or provider presents a claim for payment for a medical item or service that the person knows or should know is not provided as claimed. 42 U.S.C. § 1320a-7a(a)(1).

b. The healthcare practitioner or provider presents a claim for payment for a medical item or service that the person knows or should know is false or fraudulent. 42 U.S.C. § 1320a-7a(a)(1)(B); 42 U.S.C. § 1320a-7b(a).

c. The healthcare practitioner or provider presents a claim for payment for a medical item or service that the person knows or should know is not provided by a licensed physician. 42 U.S.C. § 1320a-7a(a)(c)(i).

d. The healthcare practitioner or provider submits a claim found to be false, fictitious or fraudulent or supported by a written statement that is false fictitious, fraudulent or lacking a material fact required to be included. 31 U.S.C. § 3801 *et seq.*

20. Simply put, government-funded healthcare is run on an honor system. Both the federal and state government rely on accurate codes and truthful representations when receiving claims. The entire network of government healthcare payors is designed to assure American taxpayers that they pay only for medical and hospital services ordered and rendered by qualified physicians.

## **PARTIES**

21. *Qui tam* plaintiff and relator, Mark Masso, is a resident of Hidalgo County, Texas. Masso brings this action for violations of 31 U.S.C. §§ 3729, *et seq.* on behalf of himself, the United States Government pursuant to 31 U.S.C. § 3730(b)(1), and the State of Texas pursuant to Texas Human Resources Code § 36.101. Masso has personal knowledge of the fraudulent

practices regarding the Defendants' claims submitted for payment by Medicare, Medicaid, and TriCare.

22.     Defendant Marquez is a resident of Hidalgo County, Texas. Marquez is a physician who practices at Cornerstone. Marquez is an approved Medicare physician with a billing number.

23.     Defendant Cornerstone is a Texas limited partnership with its principal place of business in Hidalgo County, Texas. Cornerstone is an approved Medicare institution with a billing number.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over the subject matter of this FCA action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

25.     This Court has supplemental jurisdiction over this case for the claims brought on behalf of the State of Texas pursuant to 31 U.S.C. § 3732(b), inasmuch as recovery is sought on behalf of the State of Texas which arises from the same transactions and occurrences as the claim brought on behalf of the United States.

26.     This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a), which provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant can be found, resides, transacts business or in which any act proscribed by section 3729 occurred." Section 3732(a) also authorizes nationwide service of process. During the relevant period, Defendants resided and/or transacted business in the Southern District of Texas and many of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

27.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found in, reside in, and/or transact business in the Southern District of Texas and because many of the violations of 31 U.S.C. § 3729 described herein occurred within this

judicial district.

## BACKGROUND

## FALSE CLAIMS

28.     In 2016, relator Mark Masso was employed by Smith & Nephew as a medical-device sales representative in the Rio Grande Valley. He sold surgical implants and trauma-room devices to hospitals and doctors in the area, including Defendants Marquez and Cornerstone. Marquez practices at Defendant Cornerstone as an orthopedic surgeon.

29.     In addition to their business relationship, Marquez came to rely on Masso. At Marquez's request, Masso would join Marquez in the operating room so that he could assist by, among other things, opening medical-device packaging, ensuring the medical operation had all items necessary to complete the scheduled procedure, and answering questions about how the medical device worked and fit.

30.     Beginning in at least early 2016, Marquez began allowing Foreign Persons to perform orthopedic surgery and other orthopedic procedures at Cornerstone. These Foreign Persons were not trained to perform orthopedic surgery or other orthopedic procedures and were not licensed to practice medicine in Texas or any other state. Because they were not licensed physicians, they could not obtain the appropriate billing numbers to submit claims to government health-insurance programs.

31.     When Masso first saw these persons in the operating rooms of Cornerstone, he immediately noticed that they did not have the badges Cornerstone required of all others in the operating room. The badges signaled that the person had completed Cornerstone's processes for credentialing and privileges, and Cornerstone staff monitored and enforced the badge requirements vigorously—except when it came to the untrained, unlicensed Foreign Persons.

32.     Hospital credentialing, sometimes referred to as healthcare credentialing, is the process of verifying that a medical provider is qualified to provide medical services. Credentialing is legally required and ensures quality and safety for patients. See, e.g. 25 Texas Admin. Code § 135.11(3) ("Surgical procedures shall be performed only by health care

practitioners who are licensed to perform such procedures within Texas and who have been granted privileges to perform those procedures by the governing body of the [Surgical Hospital], upon the recommendation of qualified medical personnel and after medical review of the practitioner's documented education, training, experience, and current competence."); 42 CFR § 16.42 ("Surgical procedures must be performed in a safe manner by qualified physicians who have been granted clinical privileges by the governing body of the [Surgical Hospital] in accordance with approved policies and procedures of the" Surgical Hospital.").

33.     Although credentialing and privileging are sometimes used interchangeably, they are different processes. Hospital credentialing, which happens first, verifies the qualifications of a provider. After credentialing, privileging grants the provider the authority to practice medicine at that site.

34.     Before physicians can provide services, their credentials must be verified to ensure they are competent and legally qualified to practice. During Cornerstone's credentialing, the hospital requests information from the provider about the provider's education, work experience, licensure, medical training, insurance, and background. Cornerstone also requests specific documents for review, including licenses, diplomas, immunization records, and insurance claims reports. Cornerstone then verifies that the provider's credentials are accurate, genuine, current, and in good standing.

35.     Even after credentialing is complete and privileges are granted, the provider must keep their information current. For example, a provider may have to provide record of a recent flu shot if their previous records indicate their current shot is expiring or not sufficient. A provider will lose their ability to be in a Cornerstone operating room if they do not keep their information current, no matter how long they have had privileges at Cornerstone.

36.     Masso himself went through an extensive application process to become credentialed and to receive privileges at Cornerstone. Once he received privileges, he was able to enter Cornerstone operating rooms. Even then, Masso's privileges dictated the narrow scope of what he could do during surgical procedures. Each day he would have to print a new badge from

a kiosk near Cornerstone's entrance. The kiosk required inputting a username and password, and it was tied into a database that verified instantly whether Masso could receive a badge for the day. Once Masso had his badge, he had to display it on his person or risk being removed from the operating suite.

37.     That was not the case for the untrained, unlicensed Foreign Persons. They did not have badges. No Cornerstone employees ever asked them to show badges or any proof that they could perform surgery on a patient. And they were never removed from the hospital for not having badges.

38.     The reasons they did not have badges are simple: They did not go through credentialing. They did not receive privileges. Neither Marquez nor Cornerstone ever required them to do so. The reason they were not required is just as simple: Marquez and Cornerstone knew that they would not pass the credentialing process and would not receive privileges because they lacked the proper education, training, and licenses. But both Marquez and Cornerstone wanted them in operating rooms and performing surgery, so Cornerstone allowed it.

39.     Despite not having been credentialed or granted privileges, Masso witnessed first-hand that untrained, unlicensed Foreign Persons were performing critical parts of surgeries. In fact, Masso saw that nearly all of the procedures that Marquez was scheduled to perform were in fact performed by untrained, unlicensed Foreign Persons. These persons would cut through tissue and bone, install artificial joints, and close the incision site, all without a license to practice medicine.

40.     It was Defendants' pattern and practice for untrained, unlicensed Foreign Persons to perform surgeries for which Marquez and Cornerstone would ultimately bill government payors. Although Masso did not attend every orthopedic procedure at Cornerstone, nearly every procedure he witnessed involved an untrained, unlicensed Foreign Person performing key and critical portions of surgeries.

**Illustrative Examples of False Claims**

41.     Illustrative examples of Marquez and Cornerstone's conduct and resulting false

10

claims include but are not limited to the following:

42.     On August 1, 2018, Marquez submitted a bill to Medicare for surgical services provided to a 62-year-old female, M.S, for partial knee replacement. Cornerstone also submitted a bill to Medicare, including charges for implants, operating room provision and staffing, and anesthesia. The bills constituted false claims because an untrained, unlicensed Foreign Person performed the entire procedure, including all critical portions of the knee replacement, Marquez billed as if he had performed the procedure, Cornerstone billed as if Marquez had performed the procedure, and both Marquez and Cornerstone billed knowing that the procedure had been performed by an untrained, unlicensed Foreign Person in violation of state and federal law.

43.     On August 1, 2018, Marquez submitted a bill to Medicare for surgical services provided to a 69-year-old female, E.B.G., for a total knee replacement. Cornerstone also submitted a bill to Medicare, including charges for implants, operating room provision and staffing, and anesthesia. The bills constituted false claims because an untrained, unlicensed Foreign Person performed the entire procedure, including all critical portions of the knee replacement, Marquez billed as if he had performed the procedure, Cornerstone billed as if Marquez had performed the procedure, and both Marquez and Cornerstone billed knowing that the procedure had been performed by an untrained, unlicensed Foreign Person in violation of state and federal law.

44.     On August 13, 2018, Marquez submitted a bill to Medicaid for surgical services provided to a 58-year-old male, H.G.J, for a total knee replacement. Cornerstone also submitted a bill to Medicaid, including charges for implants, operating room provision and staffing, and anesthesia. The bills constituted false claims because an untrained, unlicensed Foreign Person performed the entire procedure, including all critical portions of the knee replacement, Marquez billed as if he had performed the procedure, Cornerstone billed as if Marquez had performed the procedure, and both Marquez and Cornerstone billed knowing that the procedure had been performed by an untrained, unlicensed Foreign Person in violation of state and federal law.

45.     Also, on August 13, 2018, Marquez submitted a bill to Medicaid for surgical

services provided to a 75-year-old female, S.R.Q., for a total knee replacement. Cornerstone also submitted a bill to Medicaid, including charges for implants, operating room provision and staffing, and anesthesia. The bills constituted false claims because an untrained, unlicensed Foreign Person performed the entire procedure, including all critical portions of the knee replacement, Marquez billed as if he had performed the procedure, Cornerstone billed as if Marquez had performed the procedure, and both Marquez and Cornerstone billed knowing that the procedure had been performed by an untrained, unlicensed Foreign Person in violation of state and federal law.

**Photo Evidence of The Scheme**

46.    Masso took photos with his phone in which a Foreign Person is performing critical portions of surgery. One photo shows the Foreign Person drilling screws into a patient's knee. He is being assisted by Cornerstone employee Eddie Hinojosa, a surgical assistant.



47.     Another photo shows an untrained, unlicensed Foreign Person preparing to insert an implant into a patient's knee. The patient's knee is completely exposed, and Cornerstone employee Juan Ozuna, a scrub tech, assists the untrained, unlicensed Foreign Person.



**Basis of False Claims**

48.     Defendants' claims submitted to the Government and the State for these procedures are false claims for lots of reasons, including but not limited to the following:

49.     ***Factually false.*** When Marquez and Cornerstone submitted their separate claims to the United States Government and the State, both warranted and represented that the services in such claims were rendered by Marquez, a duly licensed physician. Many of the professional services rendered, if not all of them, in part or in whole, to the patients were nevertheless those of untrained, unlicensed Foreign Persons. These claims therefore were factually false. Factually false claims involve an incorrect description of goods or services or a request for reimbursement for goods or services never provided. Here, the submitted claims falsely identify Marquez as the

physician who performed the billed-for services when in fact untrained, unlicensed Foreign Persons had rendered those services.

50.     For example, Marquez made false representations when he billed Medicare for patient S.R.Q. She underwent a knee replacement procedure at Cornerstone on August 13, 2018. Marquez submitted a claim on form CMS-1500 to Medicare for his services, and billed as if he had performed the operation. This claim is factually false because Carlos Adan Damian Cabrera, an untrained, unlicensed Foreign Person, performed the surgery. Yet Damian Cabrera's name appears nowhere on the claim that was submitted. Relator has seen Marquez's form CMS-1500 claim that he submitted for this procedure, so Relator knows that Marquez billed as if he had performed the surgery.

51.     Marquez's claims submitted for M.S., E.B.G., and H.G.J. are all factually false for the same reason. Marquez billed government payors as if he had performed the operation when in fact an untrained, unlicensed Foreign Person performed the surgery. Relator has seen each of these three CMS-1500 claim forms that Marquez submitted for the procedures, so Relators knows that Marquez billed as if he had performed the operation.

52.     Similarly, Cornerstone made false representations when it billed Medicare for each of these patients. In each instance, Cornerstone listed Marquez, and only Marquez, as the operating surgeon on the claims it submitted on form CMS-1450 to Government Payors. However, untrained, unlicensed Foreign Persons performed these procedures. Relator has seen all four of these CMS-1450 claim forms that Cornerstone submitted for the procedures, so Relator knows that Cornerstone listed only Marquez as the operating surgeon.

53.     By generating these claim records, both Marquez and Cornerstone knowingly created and used false records under the FCA.

54.     ***Legally false.*** These claims were also legally false because Marquez and Cornerstone falsely certified that the procedures complied with various federal and state laws

and regulations when in fact, they violated such laws.[1]

55.     Marquez and Cornerstone signed CMS Provider Agreements, which are required to establish eligibility to receive payment and reimbursement from Medicare, Medicaid, and TriCare. The Agreements require certification as follows: "I agree to abide by the Medicare laws, regulations and program instructions that apply to [me] . . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare."

56.     Similarly, both Marquez and Cornerstone signed Electronic Data Interchange Enrollment Forms, a prerequisite to receiving payment for electronic claims submitted to government healthcare programs, and these forms require Marquez and Cornerstone "to abide by the laws, regulations and the program instructions of Medicare."

57.     In addition, Cornerstone submits an annual cost report to the Center for Medicare and Medicaid Services, which must be certified by the hospital administrator or chief financial officer as a condition of payment. *See* C.F.R. §§ 413,1(a)(2); 413,23(f)(4)(ii). The signatory must certify that he or she is "familiar with the laws and regulations regarding the provisions of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations."

58.     The untrained, unlicensed Foreign person's performance of surgical procedures violated a host of federal and state laws and regulations. For example, 42 U.S.C. § 1320c-5(a)(2) requires Medicare and Medicaid providers to provide services that meet "professionally

---

[1] Note that under the implied false certification theory approved by the United States Supreme Court, FCA "liability can attach when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 181 (2016). Thus, certification to comply with laws itself is not needed to show liability. But here both Defendants actually certified that they would comply with applicable laws.

recognized standards of healthcare." Similarly, 42 U.S.C. § 1395y(a)(1)(A) provides that "[n]o payment may be made under part A or part B for any expenses incurred for items or services . . . which . . . are not reasonable and necessary." Surgery performed by untrained and unlicensed persons does not meet recognized standards of healthcare nor is it ever medically reasonable or necessary.

59.     Texas Administrative Code § 135.11(b)(3) requires that surgical procedures in Texas must be "performed only by health care practitioners who are licensed to perform such procedures within Texas and who have been granted privileges to perform those procedures by the governing body of the" hospital. Similarly, 42 CFR § 16.42 states that "[s]urgical procedures must be performed in a safe manner by qualified physicians who have been granted clinical privileges by the governing body of the [Surgical Hospital] in accordance with approved policies and procedures of the" Surgical Hospital. Here, the Foreign Persons were not licensed in Texas and were not granted privileges by Cornerstone to perform surgery (nor could they have been).

60.     Cornerstone and Marquez's knowing failure to comply with the above laws render each claim false that is tied to the surgery scheme.

**Cornerstone's Knowledge and Support**

61.     Cornerstone made a concerted effort to conceal and perpetuate the scheme so that Marquez could continue his overdone surgery schedule. Cornerstone has a strong financial incentive to maintain Marquez's high volume of surgeries. Marquez charges Medicare and Medicaid about $4,000 per surgery; Cornerstone charges between $45,000 to $65,000 per surgery.

62.     Cornerstone facilitated the presence of the Foreign Persons in operating rooms by breaking its own rules. None of the Foreign Persons had gone through credentialing and none were given privileges. None had badges. Yet all were allowed to be in the operating room and to perform surgical procedures. Cornerstone's CEO, Roxanna Godinez, was particularly strict about the badge requirement. While making rounds in Cornerstone, she would personally request to see badges and would have people removed who did not have them. However, Cornerstone's CEO

16

never did this to the Foreign Persons despite knowing that they were in the operating suite and the operating rooms, and that these persons were not trained or qualified to be there.

63.     In fact, Cornerstone's CEO, along with other Cornerstone employees including Eddie Hinojosa (a certified first assistant) and Juan Ozuna (a scrub tech), participated in celebratory dinners with the Foreign Persons. The celebrations were labeled as the completion of the Foreign Persons participation in an Institute jointly offered by Cornerstone and Marquez. The Foreign Persons would share their experiences and would receive certificates documenting their time performing surgery at Cornerstone. For example,



64.     The certificate shows that Jose Dinonisio Palacios Barajas completed a one-year program titled "Total Joint Replacement, Robotic & Navigated Joint Replacements and Sports Medicine." The certificate has logos for both Marquez and Cornerstone. Marquez signed the certificate. However, the program is completely made up. Neither Marquez nor Cornerstone have ever applied for or been granted permission to operate or bill government payors for such a program.

65.     Cornerstone employees were also in the operating rooms while this happened, assisting the untrained, unlicensed Foreign Persons who were performing operations. Scrub techs like Juan Ozuna handed them instruments to use on patients. Surgical Assistants such as Eddie Hinojosa provided the same type of support and assistance given to Dr. Marquez. While assisting, Cornerstone employees knew that the Foreign Persons should not have been performing surgery.

66.     Even more telling, Cornerstone assisted in keeping the Foreign Persons off documents and records to hide that they were even in Cornerstone operating rooms, let alone performing surgery on Cornerstone patients. Surgery hospitals are required to log all persons in an operating room during a procedure. These logs are kept by a circulator nurse and the purpose is to document who is in the operating room and for what purpose. But, for example, Jose Dionisio Palacios Barajas, one of the unlicensed, untrained Foreign Persons, does not appear on any Cornerstone operating room logs, even though Masso observed him in Cornerstone operating rooms performing surgery on patients, and even though Marquez and Cornerstone employees gave him a certificate documenting that he performed surgeries at Cornerstone for a year March 2016 to March 2017. His absence from the operating room records was purposeful and accomplished with Cornerstone's assistance. By generating these inaccurate logs, Cornerstone knowingly created and used false records under the FCA.

67.     In the few instances where Cornerstone did log a Foreign Person's presence in an operating room, their role in the room was obscured. For example, Carlos Adan Damian Cabrera appears in the operating log for the H.G. procedure on August 13, 2018, but he is listed as an observer. In fact, Damian Cabrera performed surgical procedures on H.G., but his role was intentionally kept off the log. The same is true for the S.R.Q. procedure. Damian Cabrera is listed only as an observer, but Masso saw him perform surgery on Quezada. For the M.S. and E.B.G. procedures, Damian Cabrera is left off the operating room logs completely, even though Masso saw that he was present and that he performed surgery on these patients. By generating these inaccurate logs, Cornerstone knowingly created and used false records under the FCA.

68.     If anyone ever questioned why the untrained, unlicensed Foreign Persons were in operating rooms, Cornerstone employees knowingly would lie and say that they were residents. However, Cornerstone has never applied for or been granted permission for a residency program.

69.     Cornerstone also intentionally kept the untrained, unlicensed Foreign Persons off patient consent forms. The main purpose of the informed consent process is to protect the patient. A consent form is a legal document that ensures an ongoing communication between the patient and the health care provider. Through the consent form, the health care provider gives information about the patient's condition and treatment options. The consent form evidences that the patient has used this information to choose the option they feel is right for them and has expressly consented to the treatment received. Importantly, the consent form must include the name of the surgeon who will perform the procedure. But Cornerstone, and Marquez, never informed patients that an untrained, unlicensed Foreign Person would operate on them, and Cornerstone intentionally left their names off of patient consent forms.

70.     Cornerstone kept the untrained, unlicensed Foreign Persons off bills submitted to Government Payors. The untrained, unlicensed Foreign Persons did not bill for patient care because they could not without a valid billing number.

**Masso's Additional Personal Experience and Observations**

71.     Masso had to follow strict procedures just to get into the hospital. He would sign in and receive his badge daily after verifying his privileges. He personally observed that the untrained, unlicensed Foreign Persons did not go through this process.

72.     Masso was consistently required to show his badge while he was in the operating suite and operating rooms. Masso personally observed that the untrained, unlicensed Foreign Persons did not have badges in the operating suite or in the operating rooms where they performed surgery.

73.     Masso observed hospital staff, including Cornerstone's CEO and nurses, consistently inspecting badges to ensure compliance. He saw that other persons, including other sales representatives trying to speak to Cornerstone staff and physicians, were asked to leave the

operating suite because they did not have badges. No one ever asked any of the untrained, unlicensed Foreign Persons to leave even though they did not have badges.

74.    Masso asked about the untrained, unlicensed Foreign Persons when he first saw one operating on a patient. Mass was told by Cornerstone staff that they were residents, but he learned later that they were not residents and that Cornerstone did not have a residency program.

75.    One of the untrained, unlicensed Foreign Persons bragged to Masso that Marquez allowed him to do an entire knee replacement procedure.

76.    Masso was asked at one point to reduce the prices of the medical equipment he sold to Cornerstone for Marquez's procedures. The CEO of Cornerstone explained to Masso that reimbursement rates from government payors was changing and the changes necessitated a change in prices. To better understand government payor reimbursement process and rates, Masso asked Dr. Marquez about his mix of patients. Marquez responded that his patients were about 80% Government Payor and 20% private pay. Marquez even provided Masso a 18-page report of patients he had billed for between August 2017 and August 2018. The report listed hundreds of patients and included the payor information. The report confirmed for Masso that Marquez had a high volume of government payor patients. Masso therefore knew that most of Marquez's procedures resulted in claims submitted to Government Payors, both by Marquez and by Cornerstone.

## COUNT 1

### Violations of the Federal False Claims Act

### [31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B)]

77.    *Qui tam* plaintiff and relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 59 of this Complaint.

78.    This is a claim for treble damages and forfeitures under the FCA, 31 U.S.C. §§ 3729, *et seq.*, as amended.

79.    Through the acts described above, Defendants submitted and/or caused to be submitted to officers, employees, or agents of the United States Government false or fraudulent

claims for payment or approval under the Government's Medicare, Medicaid, and/or TriCare program with knowledge of their falsity, or with grossly negligent or reckless disregard of facts and conditions that would indicate that said statements or records were inaccurate or inappropriate and false.

80.     Through the acts described above, Defendants made, used, or caused to be made or used, false records and statements to obtain government payment of false or fraudulent claims which would not have been paid if the truth were known. Defendants had knowledge of the falsity of the records or statements, or had grossly negligent or reckless disregard of facts and conditions that would indicate that said statements or records were inaccurate or inappropriate and false.

81.     Plaintiff, the United States Government, unaware of the falsity of these claims, records, and/or statements made by Defendants, and in reliance on the accuracy thereof, paid Defendants for medical and/or physician services performed by someone who was not the physician listed in the claim, record, and/or statement and/or services that were tainted by violations of federal law.

82.     By reason of defendants' false records, statements, claims, and omissions, the United States has been damaged in the amount of many millions of dollars. For each bill that is tainted by the Defendants' illegal acts and scheme, the United States Government is entitled to treble damages and forfeitures as well as the per-claim penalty amount under the False Claims Act.

## COUNT 2

### False Claims Conspiracy

### [31 U.S.C. §§ 3729(a)(1)(C)]

83.     *Qui tam* plaintiff and relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 59 of this Complaint.

84.     This is a claim for treble damages and forfeitures under the FCA, 31 U.S.C. §§ 3729, *et seq.*, as amended.

85.     Through the acts described above, Defendants entered one or more conspiracies among and between themselves and others to defraud the United States Government by getting false and fraudulent claims approved or paid. Defendants, moreover, took substantial steps in furtherance of those conspiracies by preparing false records and claims and submitting such documents to the Government via the Medicare, Medicaid, and TriCare system for payment or approval.

86.     A known or intended result of Defendants' conspiracy was to induce the Government to pay for physician services performed by someone who was not the physician listed in the claim and/or for fraudulent hospital services and medical care as described above.

87.     Plaintiff, the United States Government, unaware of the falsity of these claims, records, and/or statements made by Defendants, and in reliance of the accuracy thereof, paid Defendants for medical and/or physician services performed by someone who was not the physician listed in the claim, record, and/or statement and/or services that were tainted by violations of federal law.

88.     By reasons of Defendants' conspiracies, and the acts taken in furtherance thereof, the United States Government has been damaged in a substantial amount. For each bill that is tainted by Defendants' illegal acts and conspiracy, the United States Government is entitled to treble damages and forfeitures as well as the per-claim penalty amount under the False Claims Act.

## COUNT 3

### Violations of the Texas Medicaid Fraud Prevention Act

### [Tex. Human Res. Code Ann. §§ 36.002(1), (4)(B).]

89.     *Qui tam* plaintiff and relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 59 of this Complaint.

90.     This is a claim for double damages and forfeitures under the TMFPA, Tex. Human Res. Code Ann § 36.001, *et seq.*, as amended.

91.     Through the acts described above, Defendants made and/or caused to be made a

false statement or misrepresentation of a material fact on an application for payment under the Medicaid program with knowledge of the misrepresentation, or with grossly negligent or reckless disregard of facts and conditions that would indicate that said statements or records were inaccurate or inappropriate and false.

92.     Through the acts described above, Defendants made, caused to be made, induced, or sought to induce the making of false statements or misrepresentations of material fact concerning information required to be provided by federal and/or state laws, rules, and regulations pertaining to the Medicaid program.

93.     Plaintiff, the State of Texas, unaware of the falsity of these claims, records, and/or statements made by Defendants, and in reliance on the accuracy thereof, paid Defendants for medical and/or physician services performed by someone who was not the physician listed in the claim, record, and/or statement and/or services that were tainted by violations of federal law.

94.     By reason of defendants' false records, statements, claims, and omissions, the State of Texas has been damaged in the amount of many millions of dollars. For each bill that is tainted by the Defendants' illegal acts and scheme, the State of Texas is entitled to double damages and forfeitures as well as the per-claim penalty amount under the statute.

## PRAYER

95.     WHEREFORE, *qui tam* plaintiff and relator prays for judgment against Defendants as follows:

96.     That Defendants cease and desist from violating 31 U.S.C. §§ 3729, *et seq.* and Texas Human Resources Code § 36.001, *et seq.*

97.     That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions, two times the amount of damages the States of Texas has sustained as a result of Defendants' actions, and the maximum civil penalty against each defendant for each violation of 31 U.S.C. § 3729, *et seq.*, and Texas Human Resources Code § 36.001, *et seq.*

98.     That *qui tam* plaintiff and relator be awarded the maximum amount allowed

pursuant to 31 U.S.C. § 3730(d) and Texas Human Resources Code § 36.110.

99.     That *qui tam* plaintiff and relator be awarded all costs and expenses of this action, including attorneys' fees and court costs; and

100.    That the United States and *qui tam* plaintiff and relator receive all such other relief as the Court deems just and proper.

## **JURY DEMAND**

101.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, *qui tam* plaintiff and relator hereby demands trial by jury.


Dated:  July 25, 2021

                                    Respectfully submitted,


                                    */s/ Omar Ochoa*
                                    Omar Ochoa
                                    S.D. Tex. Bar No. 2081960
                                    OMAR OCHOA LAW FIRM PC
                                    121 N. 10th Street
                                    McAllen, Texas 78543
                                    Telephone: (956) 630-3266

                                    Victor Rodriguez
                                    S.D. Tex. Bar No. 562260
                                    VICTOR RODRIGUEZ LAW FIRM PC
                                    121 N. 10th Street
                                    McAllen, Texas 78543
                                    Telephone: (956) 630-3266

                                    *Attorneys for Relator Mark Masso*