United States District Court
Southern District of Texas
**ENTERED**
December 09, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 7:20-CV-022 |
| | § | |
| CORNERSTONE REGIONAL HOSPITAL, | § | |
| L.P., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Before the Court are Defendants Raul A. Marquez's and Cornerstone Regional Hospital, L.P.'s respective Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. Nos. 116, 118). Having considered the Motions, Relator Mark Masso's Responses, (Dkt. Nos. 122–123), Defendants' Replies, (Dkt. Nos. 125–127), and relevant evidence submitted by the parties, (Dkt. Nos. 117, 119, 122, 123, 126), the Court **GRANTS** the Motions.

## I.    Factual and Procedural Background[1]

In 2016, Relator Mark Masso ("Relator") was a medical-device sales representative in the Rio Grande Valley for Smith & Nephew. (Dkt. No. 62 at 8).[2] Relator sold surgical implants and trauma-room devices to Defendants Raul A. Marquez ("Dr. Marquez") and Cornerstone Regional Hospital, L.P. ("Cornerstone") (collectively "Defendants"). *Id.* Dr. Marquez practiced at Cornerstone as an orthopedic surgeon. *Id.* Relator would join Dr. Marquez in the operating room,

---

[1] The Court restates its fulsome account of this case's factual and procedural history as previously set forth in the Court's Order Denying Defendants' Motions to Dismiss, (Dkt. No. 79 at 1–4), and supplements the account with procedural events following that Order.

[2] All page citations in this Order refer to the page numbers assigned by the Court's CM/ECF system, not the document's internal pagination, when available.

helping by "opening medical-device packaging, ensuring the medical operation had all items necessary to complete the scheduled procedure, and answering questions about how the medical device worked and fit," among other things. *Id.*

Relator alleges that in early 2016, if not sometime before, Dr. Marquez started allowing "Foreign Persons" to perform orthopedic procedures at Cornerstone. *Id.* According to Relator, these individuals "were not trained to perform orthopedic surgery or other orthopedic procedures and were not licensed to practice in Texas or any other state." *Id.* Because they were not licensed, the "Foreign Persons" could not obtain billing numbers required to submit claims to government health-insurance programs. *Id.* Dr. Marquez was an approved Medicare physician with a billing number, and Cornerstone was an approved institution with a billing number. *Id.* at 7.

The two "Foreign Persons" who Relator names are Jose Dinonisio Palacios Barajas ("Palacios") and Carlos Adan Damian Cabrera ("Damian"). *Id.* at 14, 17–18. Relator allegedly witnessed these unlicensed individuals perform "critical parts of surgeries," including "cut[ting] through tissue and bone, install[ing] artificial joints, and clos[ing] the incision site." *Id.* at 10. Relator alleges that almost all procedures scheduled to be performed by Dr. Marquez were performed by these unlicensed individuals. *Id.* Cornerstone's employees allegedly assisted the unlicensed individuals as they performed these operations. *Id.* Relator documents four specific knee replacement procedures as "Illustrative Examples of False Claims" in which Relator asserts that the unlicensed individuals performed "the entire procedure." *Id.* at 10–11.

On August 1, 2018, an unlicensed "Foreign Person" allegedly performed two right knee replacements on two Medicare patients. *Id.* at 10. Dr. Marquez and Cornerstone each submitted bills to Medicare, listing only Dr. Marquez as the operating physician. *Id.* On August 13, 2018, an unlicensed "Foreign Person" allegedly performed a right knee replacement on an individual covered by Texas Medicaid. *Id.* On the same day, an unlicensed "Foreign Person" allegedly

performed a total knee replacement on another individual covered by Texas Medicaid. *Id.* at 10–11. Dr. Marquez and Cornerstone each submitted bills to Medicaid for these procedures, listing only Dr. Marquez as the operating physician. *Id.* Relator included two photographs purporting to show unlicensed individuals performing a critical portion of the surgery. *Id.* at 12–13.

For each of the four documented procedures, Relator alleges that Dr. Marquez and Cornerstone billed Medicare or Medicaid as if Dr. Marquez performed the procedures, despite knowing that the medical services rendered were "those of untrained, unlicensed Foreign Persons." *Id.* at 13. Thus, Defendants "falsely identif[ied] Marquez as the physician who performed the billed-for services" and "falsely certified that the procedures complied with various federal and state laws and regulations." *Id.* at 13–15.

Relator filed his Original Complaint on January 24, 2020. (Dkt. No. 1). Pursuant to 31 U.S.C. § 3730(b)(2), the Court sealed the Complaint. The United States filed its Notice of Election to Decline Intervention on June 28, 2021. (Dkt. No. 6). The State of Texas filed its Notice of Election to Decline Intervention on July 1, 2021. (Dkt. No. 8). On the same day, the Court issued an order unsealing the Complaint. (Dkt. No. 7). Relator then filed his First Amended Complaint on July 9, 2021, alleging claims for violations of the Federal False Claims Act ("FCA") and violations of the Texas Medicaid Fraud Prevention Act ("TMFPA"). (Dkt. No. 10). On April 4, 2022, after receiving motions to dismiss from Defendants, the Court entered an order granting Relator's request to conduct limited discovery of the four procedures identified on August 1 and 13, 2018, and granting Relator leave to file an amended complaint. (Dkt. No. 54). Relator filed his Second Amended Complaint on July 25, 2022. (Dkt. No. 62).

Dr. Marquez and Cornerstone each filed a Motion to Dismiss the Second Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) on August 29, 2022. (Dkt. Nos. 66–67). The State of Texas filed a Statement of Interest responding to Dr. Marquez's

Motion on October 3, 2022. (Dkt. No. 71). Relator filed an omnibus Response on the same day. (Dkt. No. 72). Dr. Marquez and Cornerstone each filed replies on October 24, 2022. (Dkt. Nos. 76–77). The Court denied Defendants' Motions on December 13, 2022, (Dkt. No. 79), and the parties proceeded with discovery.

Dr. Marquez and Cornerstone filed the Motions for Summary Judgment currently before the Court on June 18, 2024. (Dkt. Nos. 116–119). Relator filed an Omnibus Response to Dr. Marquez's Motion on August 2, 2024, (Dkt. No. 122), and to Cornerstone's Motion on August 3, 2024, (Dkt. No. 123). Cornerstone filed its Reply on August 9, 2024, (Dkt. No. 125), and Dr. Marquez filed his Reply on August 15, 2024, (Dkt. No. 127). The Court now considers these Motions.

## II.    Discussion

### A.  Standard of Review

A district court must grant summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is material if it might affect the outcome of the lawsuit under the governing law and is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party moving for summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings and materials in the record, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(a), (c). Once the moving party carries its burden, the burden shifts to the nonmovant to go beyond the pleadings and provide specific facts showing the existence of a genuine issue for trial. *Celotex*, 477 U.S. at 324; FED. R. CIV. P. 56(c). In conducting its review of the summary judgment record, the court "may not make credibility determinations or weigh the evidence" and must resolve doubts and reasonable inferences regarding the facts in favor of the

nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255; *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006). However, the nonmovant cannot satisfy its burden with "conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010); *see also Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.").

### B.  Summary of the Claims

Relator asserts causes of action against Defendants under the FCA's presentment, false statement, and conspiracy provisions and under the TMFPA. (Dkt. No. 62 at 20–23). Defendants move for summary judgment on all claims. The Court will first address the FCA presentment and false statement claims as to Dr. Marquez and then as to Cornerstone. The Court will then address the FCA conspiracy claim as to both Defendants followed by the TMFPA claim as to both Defendants. The Court finds that there is no genuine dispute of material fact as to any of Relator's claims against either Defendant and, therefore, grants summary judgment on all claims.

### C.  False Claims Act Liability: Presentment and False Statement

Relator alleges that Dr. Marquez and Cornerstone violated the False Claims Act's presentment and false statement provisions. (Dkt. No. 62 at 20–21); 31 U.S.C. §§ 3729(a)(1)(A)–(B). A person is liable for presentment if he or she "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). A person is liable for a false statement if he or she "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* § 3729(a)(1)(B).

As this Court recognized in its April 22, 2022 Order and its December 13, 2022 Order, (Dkt. Nos. 54 at 6, 79 at 6), courts identify similar elements for both claims even though the two

claims are not identical. The four elements of a presentment claim are: "(1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)."[3] *United States ex rel. King v. Solvay Pharms., Inc.*, 871 F.3d 318, 324 (5th Cir. 2017) (citation omitted). A false statement claim shares the first three elements of a presentment claim but does not include the fourth element of presentation of the claim to the government. *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009) (setting forth the elements for a false statement claim in the motion-to-dismiss context). Instead, a false statement claim requires "the recording of a false record, when it is made with the requisite intent." *Id.*

### 1. Dr. Marquez

The Court first addresses Relator's presentment and false statement claims against Dr. Marquez.[4] Relator premises these claims on his central allegation that Dr. Marquez knowingly allowed unlicensed individuals to perform medical procedures—specifically knee surgeries—and

---

[3] The Fifth Circuit has stated the fourth element in two ways. First, the fourth element requires a plaintiff to show that the fraudulent activity "caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009) (adopting the Fourth Circuit's test for an FCA claim). Second, citing *Longhi*, the fourth element requires a plaintiff to allege that a fraudulent claim "is presented to the government." *United States ex rel. Steury v. Cardinal Health*, 625 F.3d 262, 267 (5th Cir. 2010) (citing *Longhi*, 575 F.3d at 467).

[4] "False claims under the FCA may be either factually false or legally false." *Waldmann v. Fulp*, 259 F. Supp. 3d 579, 590 (S.D. Tex. 2016) (quoting *United States ex rel. Bennett v. Medtronic*, 747 F. Supp. 2d 745, 765 (S.D. Tex. 2010)) (internal quotation marks omitted). "Factually false claims involve an incorrect description of goods or services or a request for reimbursement for goods or services never provided." *Id.* (internal quotation marks omitted). "Alternatively, legally false claims arise when a party that submits claims to the government affirmatively certifies compliance with a statute or regulation and the certification is a material condition to receiving a government benefit." *Id.* (quoting *Bennett*, 747 F. Supp. 2d at 765–66) (internal quotation marks omitted).

This Court has noted that "[s]ome commentators have recognized that the distinction between factually and legally false certifications can be both blurry and unhelpful." *Waldmann*, 259 F. Supp. 3d at 590 n.2 (alteration in original) (quoting *United States ex rel. Ligai v. ETS–Lindgren Inc.*, No. CIV.A. H-112973, 2014 WL 4649885, at *9 (S.D. Tex. Sept. 16, 2014), *aff'd sub nom. United States ex rel. Ligai v. ESCO Techs., Inc.*, 611 Fed. App'x 219 (5th Cir. 2015)). This Court also noted that "it considers the distinction" between factual and legal falsity "to be a logical one, not a legal one." *Id.* Although Relator addresses his FCA claims in terms of factual and legal falsity, the Court does not consider it useful to do so in this Order.

submitted bills to Medicare and Medicaid with Cornerstone's help representing that only Dr. Marquez performed the entirety of those same surgeries. (Dkt. No. 62 at 10–14). The Court agrees with Dr. Marquez that Relator does not present evidence sufficient to show a genuine issue of material fact to support these claims.

The strongest evidence of Dr. Marquez's alleged false statement or fraudulent course of conduct are (1) operating room logs for fourteen surgeries showing the unlicensed individuals in the operating room before and after Dr. Marquez, (Dkt. Nos. 119-9; 122-2 at 2; 122-12); (2) pictures taken by Relator showing the unlicensed individuals holding surgical devices over patients on the operating table, (Dkt. Nos. 117-2 at 59; 122-9); and (3) bills submitted to the government listing only Dr. Marquez as the operating surgeon, (Dkt. Nos. 122-2 at 3; 122-3 at 2). Although this evidence facially suggests factual and legal discrepancies, it does not raise a genuine issue of material fact about who performed and billed for the surgeries when analyzed with the parties' additional evidence.

Of the fourteen operating room logs listing unlicensed individuals, Relator gives particular attention to that of patient S.Q.[5] According to Relator, S.Q.'s surgery log shows that "Damian, an Unlicensed Fellow, was in the OR at 1:46 p.m.—which is listed as the surgery start time—and that [Dr.] Marquez did not come into the OR until nearly 30 minutes later at 2:15 p.m." (Dkt. Nos. 122 at 6; 122-2). Relator also notes that "[Dr.] Marquez left the OR at 3:24 p.m. but Damian remained in the OR for almost 30 more minutes until 4:13 p.m.—the listed surgery end time." *Id.* The same is true of the other thirteen operating room logs: one of the unlicensed individuals entered the operating room before or at the same time as Dr. Marquez and left the operating room at the same time as or after Dr. Marquez. (Dkt. Nos. 119-9; 122-12). According to Relator, these time

---

[5] Consistent with the parties' briefing, the Court uses initials to reference patients' personal, identifying information to maintain the patients' confidentiality.

differentials signify that the unlicensed individuals started and ended the actual operations without Dr. Marquez. (Dkt. No. 122 at 6–7). The unlicensed individuals' assistance in the operating room thus allegedly allowed Dr. Marquez to conduct more surgeries during a day than he otherwise would have been able to. *Id.* Additionally, Relator argues that the time differentials contradict Dr. Marquez's testimony that the unlicensed individuals "would not be in an operating room without [him]" present. (Dkt. Nos. 122 at 6 n.10; 122-7 at 128:6–25).

Without more, the operating room logs fail to prove a false statement or fraudulent course of conduct by Dr. Marquez. As Dr. Marquez notes, these same fourteen operating room logs, including the one for S.Q.'s surgery, each shows Dr. Marquez in the operating room before or at "cut time," which is when the surgical procedure actually begins. (Dkt. Nos. 119-9; 122-12; 127 at 2). Relator also presents no evidence that Dr. Marquez scheduled and performed more surgeries daily than is standard practice. The only evidence Relator cites is his own testimony and presence in the operating room. (Dkt. Nos. 122 at 6 n.9; 122-5 at 58:20–59:4). Such limited evidence is insufficient at summary judgment. *See Eagan v. Walgreen Co.*, No. 21-20352, 2022 WL 683636, at *3 (5th Cir. Mar. 8, 2022) (quoting *Vinewood Capital, LLC v. Dar Al-Maal Al-Islami Trust*, 541 Fed. App'x 443, 447 (5th Cir. 2013)) ("[A] party's uncorroborated self-serving testimony cannot prevent summary judgment, particularly if the overwhelming documentary evidence supports the opposite scenario.").

Next, Relator submits twelve photographs purporting to show Damian and Palacios touching patients on the operating table, moving patients' limbs, holding medical devices over the patients, and performing portions of the surgeries. (Dkt. No. 122-9). Relator asserts that one photograph in particular, (Dkt. No. 122-9 at 8), "shows Palacios cutting bone." (Dkt. No. 122 at 13). During his deposition, Dr. Marquez testified that the person holding the instrument in that photograph, who Dr. Marquez could not identify, was not "touching the bone" but was "close to

the bone." (Dkt. No. 122-7 at 213:21–214:6). Dr. Marquez also testified that he allowed the unlicensed individuals to "touc[h] the bone" to "ge[t] the fine points of how to do the surgery," but "they are not doing the surgery." *Id.* at 214:11–24. Additionally, Dr. Marquez testified that he would allow the unlicensed individuals to conduct the "mapping" of the patient pre-surgery but would then "erase" those marks and "do it [him]self." *Id.* at 215:1–5.

Contrary to Relator's suggestion, these pictures and deposition testimony provide no evidence that an unlicensed individual performed part of any surgery. In addition to Dr. Marquez's testimony, Damian and Palacios each testified that he never performed any part of a surgery. (Dkt. Nos. 117-2 at 32:24–33:9; 117-3 at 44:25–45:20). But when asked to "name a single instance, a single procedure, a single date when [Relator] saw a foreign physician . . . place an implant," Relator testified, "I can't recall a specific day" because "it just happened all the time." (Dkt. No. 117-1 at 61:25 – 62:7). When asked about the four surgeries that Relator specifically alleges in his complaint, Relator testified, "I can't recall those four procedures. It was just every case I was in." *Id.* at 97:21–98:5. Relator's vague and conclusory assertions fail to identify any facts that raise a genuine issue of material fact as to whether unlicensed individuals actually performed any surgery. *Cf. Waldmann*, 259 F. Supp. 3d at 589, 591–605 (detailing Relator's evidence showing genuine issues of material fact as to an alleged surgery delegation scheme to support allegations of a false statement or fraudulent course of conduct).

Finally, Relator argues that all bills Dr. Marquez submitted to Medicare falsely represented that Dr. Marquez performed the billed-for surgeries. (Dkt. No. 122 at 5). For example, the Medicare Part B Texas Health Insurance Claim Form Dr. Marquez submitted for S.Q.'s surgery lists Dr. Marquez as the "referring provider" and includes Dr. Marquez's signature as the "physician or supplier," certifying the accuracy of the claim. (Dkt. No. 122-3 at 2). Likewise, the Medicare Part A Texas CMS-1450 Form Dr. Marquez submitted for S.Q.'s surgery lists Dr.

Marquez as the "attending" and "operating" provider. (Dkt. No. 122-4 at 2). These representations would be problematic if there were a genuine issue of material fact about who performed the surgeries. But as the Court has explained, no such issue exists based on the evidence provided. Indeed, these two Medicare forms are Relator's only evidence to show Dr. Marquez billed government payors for surgeries he allegedly did not perform. *See generally* (Dkt. Nos. 122, 123). As a result, there is no evidence suggesting a Medicare bill listing only Dr. Marquez as the operating surgeon in S.Q.'s surgery is factually or legally false. Without more, the Court has no evidence demonstrating a pattern or practice of false statements or fraudulent course of conduct by Dr. Marquez.

Because Dr. Marquez has shown there is no evidence to satisfy the first element of a presentment claim or a false statement claim, the Court finds that there is not a genuine issue of material fact regarding the role of unlicensed individuals in medical procedures and grants Dr. Marquez's motion for summary judgment on Relator's presentment and false statement claims under the FCA.

### 2. Cornerstone

Next, the Court considers Cornerstone's motion for summary judgment on Relator's FCA presentment and false statement claims against the hospital. As with Relator's FCA claims against Dr. Marquez, the Court finds that Cornerstone is entitled to summary judgment on Relator's assertions that it submitted factually and legally false bills.

Relator's presentment and false statement claims against Cornerstone boil down to Relator's contention that "Cornerstone knowingly and fraudulently billed government payors for its hospital services during [surgeries that unlicensed individuals performed] because [Cornerstone] identified Dr. Marquez as the operating surgeon for surgeries on his patients after knowingly participating in the scheme." (Dkt. No. 118 at 20–21). Cornerstone argues that established facts and evidence before the Court fail to support either pillar of Relator's contention.

First, Cornerstone asserts that it "furnished its hospital services to Dr. Marquez and his patients as it would to any other physician performing surgeries at the hospital," and Relator has provided no evidence to the contrary. *Id.* at 21. Second, Damian and Palacios "irrefutably disavowed any involvement in actually performing the surgery itself," although they and Dr. Marquez "acknowledged that Dr. Marquez allowed [them] to occasionally hold and demonstrate with an instrument to learn the robotics, including to practice taking measurements or placing markers" before Dr. Marquez "would erase the measurements or markers they took and follow up to perform and complete the surgery himself." *Id.*; (Dkt. Nos. 119-2 at 203:22–204:12; 119-3 at 71:3–9; 119-4 at 44:25–45:7).

For his part, Relator asserts that Cornerstone submitted factually and legally false claims to the government when Cornerstone submitted CMS-1450 Forms to receive payment for surgical procedures under Medicare Part A that listed Dr. Marquez as the "attending provider" and "operating provider," though he allegedly did not perform the entire surgery. (Dkt. No. 122 at 7–12). Relator's primary evidence is the CMS-1450 Form submitted for S.Q.'s surgical procedure. (Dkt. No. 122-2 at 3). This form lists Dr. Marquez as the "attending" physician and the "operating" physician and does not list any "other" individuals who performed or completed part or all of the billed-for procedure. *Id.* S.Q.'s operating log, however, shows Dr. Marquez entering the operating room thirty minutes before and leaving the operating room thirty minutes after Damian. *Id.* at 2. As discussed above, Relator suggests this time differential demonstrates that Damian performed at least part of the billed-for procedure, despite the CMS-1450 Form stating otherwise. *See supra* Section II(C)(1); (Dkt. No. 122 at 8–9).

Additionally, Relator argues that the CMS-1450 Form for S.Q.'s procedure, as representative of Cornerstone's other CMS-1450 Forms, is legally false because it (1) contradicts Cornerstone's certifications that Dr. Marquez was the sole provider for the billed-for services in a

CMS Provider Agreement, EDI Enrollment Form, and Annual Cost Reports[6], and (2) violates Texas Administrative Code section 135.11(b)(3) and 42 CFR § 16.42, both of which require surgical procedures to be performed only by licensed individuals granted surgical privileges by the hospital. (Dkt. No. 122 at 9–10 n.18).

In response, Cornerstone sets forth the following "undisputed facts:" "(1) the procedures at issue were those scheduled by Dr. Marquez for his patients; (2) Dr. Marquez was present for all procedures; (3) Dr. Marquez was (and still is) a licensed orthopedic surgeon in Texas; (4) Dr. Marquez was credentialed and had privileges at Cornerstone; and (5) Dr. Marquez signed his surgical notes following each procedure describing and attesting to him performing the surgery – which is consistent with the testimony of the foreign physicians themselves and Dr. Marquez." (Dkt. No. 125 at 6).

The Court agrees with Cornerstone. Relator bases his entire argument on the allegation that Dr. Marquez did not perform portions of surgeries for which he billed. But as the Court details above, Relator's best evidence of this allegation is not enough to overcome summary judgment. *See supra* Section II(C)(1). As with Dr. Marquez, Relator's "mere scintilla of evidence," supported only by Relator's "unsupported speculation," fails to demonstrate any wrongdoing by Cornerstone. *Chaney*, 595 F.3d at 229; *Brown*, 337 F.3d at 541.

---

[6] Relator asserts that though Cornerstone has not produced these documents by "claiming the limited scope of discovery does not require it," the documents are not required to demonstrate legal falsity because (1) "no party contests that it would be illegal for an [unlicensed individual] to perform surgery and that the government would not pay for a bill for such a procedure," and (2) "under the implied false certification theory, . . . FCA liability can attach when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement." (Dkt. No. 122 at 9 n.18) (quoting *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 181 (2016)) (internal quotation marks omitted). The Court does not address these arguments here because as the Court has stated, it need not address legal falsity separately from factual falsity. *See supra* note 4. This is particularly the case when, as here, the Court finds no genuine dispute of a material fact to support factual falsity, and factual falsity serves as the basis for Relator's legal falsity arguments.

Even were the Court to find a genuine dispute of material fact as to the first element of Relator's presentment and false statement claims, Cornerstone has met its burden of showing no such dispute as to the second element—that Cornerstone, with the requisite scienter, allegedly made the false statements or carried out the fraudulent course of conduct. Under the FCA, Relator can meet the scienter requirement by showing that Cornerstone acted "knowingly" if Cornerstone had "actual knowledge of the information," "act[ed] in deliberate ignorance of the truth or falsity of the information," or "act[ed] in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). Proof of specific intent is not required. *Id.*

Relator presents insufficient evidence to support his claim that Cornerstone knew that Dr. Marquez allegedly allowed unlicensed individuals to perform parts of surgeries. According to Relator, hospital staff "saw Unlicensed Fellows operate on patients and assisted them" and "did not stop Unlicensed Fellows from operating on patients even when [Dr.] Marquez was in the room." (Dkt. No. 122 at 17). Relator also asserts that Cornerstone staff failed to enforce the unlicensed individuals' observation-only privileges, such as requiring the unlicensed individuals to wear badges in the operating room. *Id.* at 18. The only support for these allegations are Relator's own self-serving testimony and Cornerstone's corporate representative testimony that "staff would know who were observers in an operating room and that staff knew that observers could not operate on patients." *Id.*; *see* (Dkt. Nos. 122-5 at 191:16–192:6, 288:7–16; 122-14 at 176:4–178:7). Here, again, such self-serving evidence is not enough, especially because the non-specific testimony of Cornerstone's corporate representative and Cornerstone's evidence weigh against Relator's assertions. (Dkt. No. 125 at 7–8); *see Eagan*, 2022 WL 683636, at *3.

Even accepted as true and viewed in the light most favorable to Relator, none of the evidence suggests that Cornerstone had actual knowledge of illegal activity, acted in deliberate ignorance of any illegal activity, or recklessly disregarded evidence of illegal activity. *See* 31

U.S.C. § 3729(b)(1)(A). As Cornerstone notes, the evidence Relator puts forth requires an "inferential leap" to reach a "speculative conclusion." (Dkt. No. 125 at 8–9). The Court's previous comment on Relator's initial allegations still rings true: "While Cornerstone may have concurrently billed for the service it provided during these alleged procedures, Cornerstone's parallel billing does not provide the 'particular details' of a scheme that imputes Dr. Marquez's conduct to Cornerstone." (Dkt. No. 54 at 14). Relator has provided no competent summary-judgment evidence for the Court to find a genuine issue of material fact as to Cornerstone's requisite scienter.

As a result, Cornerstone has demonstrated the absence of a genuine issue of material fact as to why Cornerstone listed Dr. Marquez on its billing submissions to government payors and is entitled to summary judgment on Relator's presentment and false statement claims.

### D. FCA Conspiracy

The Court next addresses Relator's FCA conspiracy claims against Dr. Marquez and Cornerstone.[7] The Court finds that Relator's conspiracy claims fail as a matter of law.

To prevail on a FCA conspiracy claim under 31 U.S.C. § 3729(a)(1)(C), Relator must "show (1) the existence of an unlawful agreement between Defendants to get a false or fraudulent claim allowed or paid by [a government payor] and (2) at least one act performed in furtherance of that agreement." *U.S. ex rel Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008). This showing includes that Defendants "shared a specific intent to defraud the [G]overnment." *Id.* (alteration in original) (quoting *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 857 (S.D. Tex. 2003)).

---

[7] Because Relator's arguments and evidence in support of its FCA conspiracy claims are the same as to Dr. Marquez and Cornerstone, the Court will address the conspiracy claims against each Defendant together.

Relator's conspiracy claims as to Dr. Marquez and Cornerstone hinge on the existence of a "fellowship" or "institute" jointly operated by Dr. Marquez and Cornerstone. (Dkt. Nos. 62 at 17; 122 at 19–22). Through this fellowship, Relator argues, Dr. Marquez trained unlicensed individuals, including Damian and Palacios, while performing surgeries at Cornerstone, and Cornerstone billed the government for procedures even when the unlicensed individuals allegedly performed parts of the surgeries. (Dkt. Nos. 62 at 17; 122 at 19–22). In support of this theory, Relator submits Palacios's certificate of completion signed by Dr. Marquez that features logos of "Marquez Robotic Orthopedic Institute" and Cornerstone Regional Hospital, and a Facebook post from "Cornerstone Orthopedic Institute" congratulating "Dr. Diego Cordero for completing a fellowship rotation with Dr Marquez" that features a picture of Dr. Cordero holding a certificate of completion with Dr. Marquez. (Dkt. Nos. 122-17; 122-21). Relator also argues that "Cornerstone had no written policies or guidelines regarding Unlicensed Fellows"; that Cornerstone's "surgical operations manual is void of any policies, directives, guidance, or restrictions regarding observers"; and that Cornerstone did not have "any vetting process," including a formal application process. (Dkt. No. 122 at 19). According to Relator, the only policies related to these programs were the unlicensed individuals' observation privileges and the patient consent forms for each procedure. *Id.* at 20–21. Relator sums up his evidence of a conspiracy as follows: "Indeed, Cornerstone and [Dr.] Marquez's repeated disregard for the purported restrictions makes no sense *but for* the existence of an agreement to engage in and protect the scheme." *Id.* at 22.

Relator provides no evidence of any actual, unlawful agreement. Instead, Relator argues that Cornerstone's lack of written policies or guidelines regarding the foreign, unlicensed individuals is proof of an agreement between Dr. Marquez and Cornerstone to protect their alleged

scheme. In short, Relator asks the court to find that the lack of evidence of an unlawful agreement is itself evidence of a conspiracy. The Court declines to do so.

"Additionally, an actionable conspiracy claim requires an underlying substantive FCA violation." *Mendez v. Drs. Hosp. at Renaissance, Ltd.*, No. 4:11-cv-02565, 2022 WL 22877427, at *7 (S.D. Tex. Feb. 24, 2022) (citing *United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 929 F.3d 721, 728–29 (D.C. Cir. 2019)). Because the Court finds that Relator fails to prove an underlying FCA violation by Dr. Marquez or Cornerstone, Relator's FCA conspiracy claims against Dr. Marquez and Cornerstone fail, as well.

### E.  TMFPA Liability

Finally, Relator alleges that Dr. Marquez and Cornerstone violated two TMFPA provisions that state: "A person commits an unlawful act if the person:

> knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under a health care program that is not authorized or that is greater than the benefit or payment that is authorized; [or]

> knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning . . . information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to a health care program."[8]

Tex. Hum. Res. Code §§ 36.002(1), (4)(B).

---

[8] When Relator filed this lawsuit, these two TMFPA provisions referred to "the Medicaid program" rather than "a health care program." *See* Tex. Hum. Res. Code §§ 36.002(1), (4)(B), effective April 2, 2015, to August 31, 2023.

As this Court has noted in other FCA cases, "Like the FCA, the TMFPA is aimed at fraudulent statements made in connection with claims made to government payors." *Waldmann*, 259 F. Supp. 3d at 633. Dr. Marquez and Cornerstone argue that Relator's TMFPA claims should fail for the same reasons that his FCA claims fail: Relator presents no evidence to support his allegations that either Dr. Marquez or Cornerstone knowingly made such false statements or misrepresentations. (Dkt. Nos. 116 at 18; 118 at 30).

The Court agrees. As explained above, Relator has not provided competent summary-judgment evidence that would allow a reasonable trier of fact to find Dr. Marquez and Cornerstone liable for FCA violations. *See supra* Sections II(C), (D). Because TMFPA liability consists of similar elements as FCA liability and Relator offers the same insufficient evidence to support these claims, Relator's TMFPA claims against Dr. Marquez and Cornerstone fail as a matter of law.

## III.    Conclusion

The Court finds that Relator has not provided legally sufficient evidence to demonstrate a genuine issue of material fact for each element of FCA presentment and false statement liability, FCA conspiracy liability, and TMFPA liability. As a result, the Court considers summary judgment proper on all of Relator's claims against both Dr. Marquez and Cornerstone.

IT IS HEREBY ORDERED that the Defendants' Motions for Summary Judgment, (Dkt. Nos. 116, 118), are GRANTED.

A final judgment will issue separately.

 SO ORDERED December 9, 2024, at McAllen, Texas.

Randy Crane
Chief United States District Judge